Brockenbrough, J.
This action is founded on a riote executed by the defendants on the 25th of September 1827, by which they promised to pay to Haywood, cashier of the state bank of North Carolina, eighty-eight days after date, the sum of 8526 dollars 47 cents, negotiable and payable at the said bank. The note was afterwards transferred to the plaintiffs. The defence is usury.
This note was the last of a series of notes given for a loan made by the plaintiffs to the defendant Cowan, of the sum of 12,000 dollars, as early as October 1824. The facts found by the jury as to the agreement between the parties at the time of the original loan, were substantially as follows. The state bank of North Carolina had declined paying specie for its own notes, and was at that time doing but little business. But when a note was offered for discount, accompanied with an offer on the part of the borrower to exchange an equal amount of northern funds for North Carolina bank notes, if the bank approved of the note, it seldom refused a discount. And when the original note aforesaid for 12,000 dollars was discounted, a condition was annexed to it, that it should be paid in Virginia or other northern bank notes. When the note was discounted, the amount thereof, deducting the discount, was paid to the defendant in notes of the plaintiffs’ own bank, or of other North Carolina banks, all of which were at that time, at Raleigh, under par from 3J to 4£ per cent, and Cowan disposed of them soon after in Petersburg at a loss of from 2& to 3£ per cent.
The officers of the bank knew of the loss to which Cowan would be subjected by the transaction : the Virginia and United States bank notes were at that time at par, and the plaintiffs knew that their notes were not of *247 equal value with Virginia or United States bank notes. The verdict does not state what was the value, at that time, of northern bank notes, other than Virginia and United States bank notes.
It has been said in the course of the argument, that by lending out its own notes at par, when they were of less value, the bank was lending out less money than the nominal amount of the loan, and thus it was receiving interest upon a larger sum than it lent out, and consequently usurious interest upon the actual loan: thus, if the notes were worth less by three per cent, than the par value, it is contended that for every 1000 dollars of its own notes lent out., the bank in fact transferred to the borrower only 970 dollars, and took an interest. at the rate of six per cent, not on the last but on the former sum.
I do not think that such a contract would of itself necessarily constitute usury. Without a stipulation to the contrary, the borrower would always have a right to repay the sum borrowed with the same kind of currency that he received. The bank could never refuse to take back its own notes, in payment of a loan of its own notes. At all events, the notes of the bank would be a good set-oil’ against the note to the bank for the nominal amount of the loan. The loan, in such case, would carry exactly six per cent, on the amount loaned, and no more. If there be usury then in this transaction, we must expect to find it in another part of the contract. It is supposed to exist in the condition which was annexed to the note, at the time it was discounted, that it should be paid “ in Virginia or other northern bank notes.”
It is true that at the time this note was discounted, Virginia bank notes, and one other kind of northern bank notes, namely, United Stales bank notes, were at par; and (on the hypothesis that the payment of the defendants’ note was to be confined exclusively to them) *248 if it had been absolutely certain that they would continue at par when the note should arrive at maturity, the 'North Carolina bank notes still continuing depre- , , . . , 5 \ ciated, then it would be a contract to receive more than leg'al interest on the sum actually loaned. But this certainty did not exist in the case. On the contrary, no one could say it was impossible that those bank notes would be depreciated in the market to the extent of three or four per cent, within the space of three months; and when we recollect that there was a period when Virginia and United States bank notes were greatly depreciated below the value of specie, and that their exchangeable value is always liable to be affected by a variety of causes, no one could have been charged with extravagance who should have said that it was not very improbable they might be depreciated. It is not only a general suspension of specie payments, which will cause a depression in the value of bank paper; an unfavourable balance of trade, an enlarged emission of paper, a heavy press for specie, whether for exportation or otherwise, and other circumstances, may temporarily produce that effect. Indeed it requires the utmost pru-' dence on the part of bankers and their dealers, to prevent that depreciation. That prudence is not always found in the management of those institutions, nor with their customers: and it can rarely indeed be said that a creditor who agrees to receive bank notes in payment of his debt at a future period, runs no risk, from the depreciation of the notes, of receiving less in value than the amount of his debt.
In contracts of loan, if there is a hazard that the creditor may receive less than his principal, it is no usury. 1 Show. 8. and Gibson v. Fristoe &c. 1 Call 81. I admit however that if the hazard is merely colourable, the contract cannot be exempted from the operation of the statute. But whether the hazard be very slight or not, is a question more proper for the consideration of a jury *249 than the court. In this case, the jury have given us no facts by which we can unhesitatingly pronounce that the hazard is merely colourable. They find that Vir- , 7-T • 7 o , , . gima and United ¡States bank notes were at par Eit the time of discounting the note; but their value at that time is not the criterion of the legality of the contract. They do not find their value at the time of payment, nor do they find that at the time of the loan the probability was, or that the contracting parties knew or believed, that those bank notes would continue at par value till the discounted note should arrive at maturity. As the jury have not found it, I do not perceive how the court can infer that by the contract of the parties the debt was to be paid off in funds which would be of greater value at the time of payment than the funds received at the time of the contract.
I will now refer to an authority heretofore approved of by this court, for the purpose of supporting my position that the uncertainty in the future value of the paper currency in which this debt was stipulated to be paid, exempts the contract from the operation of the statute. I mean Pike v. Ledwell, 5 Esp. Rep. 164. The defendant being possessed of £ 400. in the three per cent, consols, it was agreed that if the plaintiff would lend him £ 160. from the 5th May 1801. to the 11th February 1804, the defendant would, within seven days thereafter, transfer to the plaintiff' £ 400. three percent, consols, or pay so much money as the said ¿£400. con-sols. would produce on the 11th February, If sold. It was proved that the value of the £ 400. stock, when the agreement was made, was £ 240. and at the time of the action brought was ¿£ 225. The counsel for the defendant contended that this was usury; for as the stock was worth £ 240. and the plaintiff had only paid £ 160. he had gained ¿£80. by his bargain, and the dividends on the stock in the mean time : that if it was sfxicl there was a contingency, because the three per cents might *250 fall to 20 or 30 per cent, he would remark that this was an impossible supposition. But lord Ellenborough said, this was not usury; that contingency in the thing put-chased was incompatible with the idea of usury, in which the principal must always be certain. He said it was admitted that if the stock, when transferred to the plaintiff (on the 18th of February) would be worth but £ 160. it would not be usury; it was very improbable that the stock would suffer that most extraordinary depreciation, but still it was within the reach of possibility. He therefore could not say that there was not some contingency in the transaction, and if so, the contract was not usurious.
In our case the usury is supposed to arise from the agreement to pay the debt in bank notes which at the time of the contract were of greater value than those lent. Those bank notes, like all others, fluctuate in value at different times and places. It was at least equally probable that they wmuld at the end of three months (or at the end of the longer period for which the defendants’ note might be and was actually continued to be discounted) be depreciated three or four percent, as that the consols, in the case above quoted would be depreciated 20 or 30 per cent. If the contingency in the value of that article was incompatible with the idea of usury, much more ought it to be so here.
I refer also to the case of Tate v. Wellings, 3 T. R. 531, and Maddock v. Rumball, 8 East 304. These cases, with many others, were before this court in Steptoe’s adm’rs v. Harvey’s ex’ors,* decided in May last. In that case, for 142 shares of Farmers bank stock, the borrower bound himself to pay to the lender 172 shares of the same stock twelve months after date. It was decided that the contract was not usurious. The court said that the article which was the subject of the contract being of a fluctuating value, the price of it at the *251 lime of the contract was no criterion of the legality of the contract, and that as the stock might fall before or at the end of the twelvemonth, so as to yield less than . , the principal with legal interest, the contract was not usurious. It was also said that it was the province of the jury to ascertain sueh facts and decide upon such motives as would constitute usury. I will quote a few passages from the opinion of the president given in that case. In reference to the plea there filed he said, “ The distinction arises out of the theoretical incapacity of the court to ascertain any fact or judge of any motive, and the power of the jury to ascertain every fact and ferret out every motive. A plea of usury therefore should, on its face, either present such facts, with certainty to every intent, as in themselves distinctly amount to an agreement to receive more than the value of six dollars for the loan of 100 for a year; or it must state the facts with such necessary averments of an intent to evade the statute, as that a jury, upon the trial, might decide that the agreement was in substance a contract for usurious interest, and a shift to evade the operation of the law. Now the rejected plea in this case is defective in either view. Take it as professing to make out a complete case of usury from the facts themselves, and it is defective; for it alleges ‘ that the loan was of 142 shares, to be returned with thirty shares more, worth at the time of the contract 100 dollars.’ But non constat what they would be worth when they were to be received ; therefore non constat that the lender would receive more than six per centum. The court cannot estimate the value, which is in its nature fluctuating; and without averments that the parties well knew that the shares would be worth more at the end of the year, and that they corruptly agreed upon that reservation as a shift to evade the statute, the court cannot see that the transaction amounted to usury.” These remarks are in my estimation as applicable to the special *252 verdic.t before us, as to the plea in that case. It is true that bank notes do not fluctuate so much as bank stock; but that they do fluctuate cannot, I think, be denied, , . 7 J . . . , and the plus or minus is ot no consequence as to the present question. Now here the jury have found that Virginia and United States bank notes were at par at the date of the contract, but they have not found that the contracting parties well knew or bad good reason to believe that they would be at par at the end of the ninety second day from the date of the note, and that such belief was one of the constituents of the agreement, nor have they found that the contract was made with intent to evade the statute. With such omission in the finding, it is not, I think, competent for the court to affirm either proposition. I do not think we can say there was usury in the contract.
There is another ground for this opinion. The condition annexed to the note when discounted was that it should be paid “in Virginia or other northern bank notes.'''’ The jury find that Virginia and United States bank notes were at that time at par; but besides these there were many other northern bank notes, and of the value of these at that time the jury say nothing. Now it might have been that some bank notes of the district of Columbia, of Baltimore, Philadelphia, New York or Boston, at that very time, were three or four per cent, below par, and according to the agreement any of them might have been applied to the repayment of this loan. I take it that if according to contract a debt may be paid out of several funds, the election is cast upon the debtor to pay out of either of the specified funds, and the creditor cannot restrict him to this or that particular fund in exclusion of the others. If then it were sufficient, to establish usury in this case, that all of the funds out of which the debt was to be paid were at par at the time of the contract, yet this finding is not sufficient to prove usury, because some of those funds were not found to be óf that value.
*253 The next question is whether the calculation of the interest in this case according to the usage of the bank, by Rowlett’s tables, which assume 60 days as one sixth and 90 days as one fourth of a year, makes this a usurious loan. It is a fortunate circumstance for us that all of the bank charters granted by our legislature allow the taking of interest in advance at the rate of one half per cent, for every thirty days; and this question can never arise here on our own bank transactions. But the charter of the state bank of North Carolina allows interest only at the rate of six per cent, per annum. My own opinion always has been that by the calculation the law is violated, and the contract founded on it (if there be no mistake as to the basis of the calculation) is usurious. That opinion is strengthened by the decision of the supreme court of New York in The Bank of Utica v. Wager, 2 Cowen 712. But there are several circumstances which compel me to acquiesce in the contrary decision.
In Crump v. Nicholas et al. 5 Leigh 251. the practice of the bank in receiving double interest for every 64th day, on accommodation notes made to renew other notes of the same character, was sustained by all of my brethren. The principal grounds of that decision were the long usage which had prevailed in banking transactions, and the great injury which would result from a contrary decision. Those grounds exist as strongly here as there; perhaps they are stronger. I have made an enquiry on this subject of the chief justice of the supreme court of appeals of North Carolina, and I am informed by him that although there has been no decision in that court on this point, yet the practice of using Rowlett’s tables may be considered as sanctioned by general judicial acquiescence. Those tables, he says, are constantly resorted to by merchants in that state, and used by juries in computing interest, and by masters in chancery in their offices; and such use of them has never re *254 ceived judicial animadversion. In the present case my , J .. . . _ . V ' brethren, constituting a majority oí the court, are ot opinion that usury does not exist in this mode of calcula- .. J , , ting interest; and for these reasons I yield my opinion.
The judgment should be reversed, and a judgment entered for the plaintiffs for the debt in the declaration mentioned.
Cabell, J.
I think the argument of my brother Brockenhrough is conclusive to shew that on the facts as found by the jury there is no usury in this transaction. Therefore I will not attempt to add any thing to what he has so strongly urged. I do not, however, concur in the opinion which I understand him to entertain, that the transaction would have been usurious if the jury had found that the parties knew, or had good reason to know, that the Virginia and other northern bank notes, in which Cowan's note was to be paid, would be at par when Cowan's note should fall due. Those notes, at par, could not be more valuable than gold and silver; and I am of opinion that if there had been an express ■stipulation that Cowan's note should be payable in gold or silver coin only, it would, not have made the transaction usurious. After deducting only the legal discount, the bank paid to Cowan the whole of the residue in that w'hich was worth to the bank so much gold or silver, and which might have been worth so much gold and silver to Cowan, had he used the means in his power to make it so. For although he received the notes of the bank in payment, those notes were the representatives of so much gold and silver, and he might instantly have demanded from the bank gold and silver for them ; and if the demand had not been met by the bank, the bank would have been liable to him for the full amount of. principal with interest from the date of the demand. The bank had no more to do with the unprofitable use ' which Cowan intended to make of the notes, than it *255 would have had with any unprofitable or improvident investment which he might have intended to make with rmld and silver, had he received gold and silver instead of notes.
I am for reversing ihe judgment, and entering judgment for the appellants.
Brooke, J.
The facts in this case have been so well stated by judge Brockenbrough, that it is not necessary again to state them, I cannot think the use of Rowlett’s tables in calculating the interest on the discount of the note amounted to usury. It cannot be referred to a corrupt intent to commit usury, but to convenience and a wish to prevent mistakes in the calculation of interest by a more tedious process. The borrower, I think, would be often exposed to the payment of higher interest by mistakes in the ordinary mode of calculating interest, than by a resort to Rowlett’s tables. The fraction over the actual interest to be paid is fully compensated for by the certainty that no mistake amounting to a greater excess is to be committed. As regards the terms on which the loan was made to Cowan, I think there was no usury. Where there is hazard, not merely colourable (which, if it existed, ought to be found by the jury) though the premium may be greater than legal interest, it is well settled that there is no usury. The case of Steptoe’s adm’rs v. Harvey’s ex’ors,* in this court, is a very strong case. Although the bank bills borrowed were at the time 3£ per cent, below their nominal value, the payment for them was to be in Virginia or other northern bank bills or funds, which might, before the day of payment, bo of less value than the bills borrowed.
Moreover, though the bank had stopped specie payments, yet it might be compelled to pay specie for the notes loaned, and could not be subjected to the charge *256 of usury, by the use the borrower chose to make of I think the judgment ought to be reversed, and judgment rendered for the plaintiffs,
Tucker, P.
The special verdict in'this case was found with a design of submitting to the judgment of the court various questions on the subject of usury. Among them are two which must be considered as perfectly settled by the decisions of this court. In the case of Stribbling v. Bank of the Valley, 5 Rand. 132. it was decided that taking the discount in advance upon discounting a note at bank was not usury; and the samé opinion was entertained by a majority of the court in the case of Crump v. Nicholas et al. 5 Leigh 251. decided after an able reargument of the question before a full court. It is indeed rather surprising that the question should have been raised at this late day, when it seems to have been held, more than sixty years ago, that in bankers’ transactions interest may lawfully be received beforehand, and that the contract should not be taken tobe a mere loan of the balance after deducting the discount. This was the opinion of justice Blackstone in Lloyd v. Williams, 2 Black. Rep. 792. and he gives as a reason, that if it were not so, every banker in London who takes 5 per cent, for discounting bills would be guilty of usury. The question has not been made by the counsel of the appellees, who has very justly acquiesced in the repeated decisions of this court and of other tribunals foreign and domestic. See Marsh v. Martindale, 3 Bos. & Pul. 158. 15 Johns. Rep. 162.
So, too, the question whether the including the day of payment of the first note in the second, whereby in point of fact the bank received under each note interest for the same day, was usury, was surrendered by mr. Leigh as having been settled by the case of Crump v. Nicholas et al. 5 Leigh 251. The only questions, then, presented for our decision are, 1. Whether the under *257 standing of the parties that the discount was to be calculated by Rowlett’s tables made the transaction usurious ? and 2. Whether the contract as set forth in the . - .. .... 3 spedai verdict was within the statute r
As to the first question. The perpetual recurrence in all mercantile and banking operations, and indeed in all the intercourse of life, of calculations of interest, having been found exceedingly inconvenient and troublesome, it seems at length to have occurred to some laborious arithmetician to furnish a remedy for the evil by the construction of accurate interest tables, graduated to years, months and days, so that in a moment the interest upon any sum for a given period may be ascertained without difficulty and with the most perfect accuracy. The idea was excellent, and the inventor (whether Rowlett or some other) 1 think entitled to be looked upon as a public benefactor. Time and the most worrying labour are saved; mistakes are prevented ; and the most ordinary man is enabled to make his calculations with unerring certainty, if he is capable of examining the tables and adding two numbers together. To men engaged in money transactions the tables are invaluable. The banker, the counting house clerk, the attorney at law, the sheriff, the clerk, all find that the use of them facilitates their labours and saves them from those mistakes which form so fruitful and vexatious a source of litigation. It is not wonderful, therefore, that Rowlett’s tables are to be found in the hands of every banker, and it is desirable that the use of them should be encouraged. Unfortunately, however, they were founded upon the false postulate that the year contained only 360 days instead of 365; a position adopted doubtless with a view to simplify the calculations, and to avoid innumerable and embarrassing fractional quantities. The effect of it however is to make the interest for every fraction of a year somewhat more than at the rate of six per centum per annum. Thus the interest *258 of 100 dollars for sixty days, by Rowlett’s tables, is (as I find by accurate calculation) one cent and one third* more than the true interest, calculating the year at 365 days. The statement of this fact, m my opinion, ought to decide the question of usury which has been made. He minimis non curat lex. It is impossible to consider as usury this excess, arising merely from the resort, for convenience and accuracy, to a work which unluckily rested upon an erroneous basis. It is not alleged, — it cannot be pretended, — that the resort to Rowlett’s tables was with intent to commit usury; but it is said that if the lender is aware that he is getting more, although he may suppose he is not infringing the statute, yet he is guilty of the offence. The principle is indeed true, but falsely applied, I think, to a case where the excess is so minute as to be unworthy of consideration by the borrower, by the lender, or by the court which sits in judgment upon their transactions. Where indeed there is a wicked intent, we may well say—
“ If thou tak’st more, — be it hut so much
As the division of the twentieth part
Of one poor scrapie; nay, if the scale do turn
But in the estimation of a hair,—
Thou diest, and all thy goods are confiscate.”
But where there is obviously no intent to infringe the statute, I cannot think it just to consider as usury the taking (even with full knowledge) of “ the twentieth part of one poor scruple” more than at the rate of six per cent. The statute has always been construed tobe aimed at corrupt agreements for usury; and hence, in pleading it, a corrupt agreement must be alleged. 1 Wms. Saund. 295 b. note 1. It is true that the taking of usurious interest is prima facie evidence of a corrupt agreement. But still the question is whether there be such an agreement ? Gould, J. in Murray v. Harding, *259 2 Black. Rep. 865. And if the intent of the contracting parties be righteous, there is no usury. Ord 37. The mere taking of an excess, then, is not usury, with- . . . .. r- i out a corrupt agreement; it is only evidence oi such agreement, but not conclusive; and if so, then the question presented is whether the taking in any particular case is such as to satisfy the mind of the existence of a corrupt agreement. Try this case by that test, and the answer must be in the negative; for the prima facie evidence is not only neutralized by the nature of the transaction itself, but in this case the presumption of corrupt agreement is moreover repelled by the obvious fact that the excess has arisen from a resort to the tables for convenience, and not for gain.
Such would be my view of this matter, even if I did not feel myself sustained by analogous cases. Thus, as we have already seen, the discount may be taken by bankers in advance. Yet every body can see that in this way they receive, upon 94 dollars actually advanced, interest amounting to 6 dollars, -whereas the year’s interest on that sum is only 5 dollars 64 cents. And every banker knows this. Why then do you not infer, from the taking of the excess, that there was a corrupt agreement ? Because the mercantile and banking usage accounts for the excess, and negatives the corrupt intent. So as to including the day of payment in the renewed note. Every banker knows that he gets double interest for that day, but yet the transaction has been sustained. I say nothing of the english cases in which excesses of a far more important character have been set down to the account of commissions, trouble &e. being well satisfied that the use of Rowlett’s tables cannot be more assailable than the taking discount in advance, which was sustained sixty years ago, when the question was of the first impression, upon the ground of public convenience, and the usages of the bankers of London. 2 Black. Rep. ubi supra.
*260 We come, lastly, to the consideration of the contract in. this case. In the year 1824, when the bank of North Carolina had suspended specie payments, the defendant Cowan made an application to that bank for the discount of a note of 12,000 dollars, and accompanied it with an offer to sell them a bill for northern funds, to be paid for in North Carolina bank notes; engaging also to pay up his note, if discounted, in northern funds. The bank discounted the note on these terms and received the bill, and paid for both Bill and note, partly in its own notes, and partly in those of other North Carolinaba.'oks, all of which were under par in comparison with northern funds. After the bill and note were discounted, the officer of the bank requested that the notes paid out should not be so disposed of as to be likely to return quickly upon the bank; which the borrower promised, as far as it lay- in his power. It also appears that at the time of this transaction, suits were depending against the bank to coerce payment of its notes; so that it was highly probable that prompt demand of any notes it might issue would be made, and followed up by efforts to enforce payment by a due course of law: to which I may add, that as the insolvency of the bank has not been alleged, it may fairly be presumed that every bill which it paid to Cowan or to Dugger has long since been paid up, cent for cent, by the bank itself, or by the other-banks whose notes it had paid over. Was this transaction usurious ? After struggling hard to sustain it, I find myself compelled to acknowledge that the transaction was usurious, and the securities therefore void.
It cannot be denied that by this negotiation the bank was a gainer, and the borrower a loser in the same degree. It has been said, indeed, that the bank was not a gainer, because it must ultimately have been bound to pay up its notes: and this indeed would be very true, if it were not obvious that the northern funds purchased by the bank with its own notes were at once *261 employed in the market to buy up those notes at the discount a.t which they were selling. Thus Cowan received 12,000 dollars of North Carolina notes for his 12.000 dollars of northern funds. The bank sends these northern funds to the market where Cowan is selling his 12.000 dollars of Carolina; paper for only 11,520 dollars, and it buys up 12,000 dollars with 11,520, thus making, upon a loan of 90 days, a gain of 480 dollars, besides 6 per cent, interest. Here then is a gain of 480 dollars to the one, and a loss of 480 dollars to the other, in 90 days, on a negotiation for a loan of bills which pass as money and are dealt with as such. Prima facie this must be considered usury.
But it is said that this was only a sale or exchange of bills, and that bills may be sold at any discount, without incurring the penalties of the laws against usury. I cannot look upon the transaction in that light. Here is a banking institution which refuses to redeem its notes in specie or in the funds of solvent banks, and while it is resisting their recovery by the due course of law, is willing to send more into circulation through the agency of needy borrowers. But mark the terms on which they are parted with. They are either paid out at once for northern funds, or they are loaned upon the stipulation that they are not to be repaid in kind, but in northern funds only. The notes thus sent into circulation come back upon the bank, indeed, for repayment, but are refused, and the holders are driven to their remedy by suit against an institution whose visible and tangible property bears generally a very small proportion to its actual wealth. The consequence of such proceeding is a further depreciation of its paper, which it again buys up, and thus very largely adds to its gains by the very act of bankruptcy. To sustain such transactions is not only to encourage usurious gains, but it is a premium upon the suspension of specie payments by any institution whose situation enables it *262 to push its notes into circulation, however depreciated they may be; a state of things which experience has proved may very well exist, in a community where , , , , banks are established an every vailage through the country.
Was the sale or exchange of these depreciated bills for northern funds, then worth 4 per cent, more, a good sale, or a usurious loan ? The latter, assuredly. The object of the transaction was a borrowing and lending. Both the note and bill were created for the purpose of raising money, and that fact was known to the bankers. They were to be paid for in bills actually worth 4 per cent. less. This, as I understand the case of Whitworth et al. v. Adams, 6 Rand. 333. was usury. For though a negotiable security, once perfected by negotiation, may be afterwards sold in the market for less than the amount due upon its face, without committing usury; yet where it is sold before it has become available, and for less than its nominal amount, or its fair value according to the course of exchange, and the buyer is privy to the fact that it is sold for the accommodation of the maker, the transaction will be void for usury. It is, in such case, nothing more than a loan to the maker upon the security of the parties to the note; and if more than legal interest is acquired, the case is within the statute. Now in this case all these ingredients concur. Until the negotiation with the bank, the note was but blank paper. The bank knew this, and yet took the note, giving only 96 dollars for every hunda'ed, besides deducting the customary discount at the rate of 6 per centum per annum.
It is said, however, that this is a contract of hazard. But the hazard which redeems a contract from the charge of usury must be real, and not colourable. The supposed hazard here is that the northern funds might depreciate in the course of 90 days, and become of less value than their own. This was indeed but a pretext. *263 What prospect was there of such a reflux in the state of things in 90 days ? What prospect that the paper of specie paying banks would sink below the level of i -3 a bank which did not pay specie: What reason was there to suppose that the plaintiffs hazarded any thing, when the resumption of specie payments was in their own discretion, and they well knew how to speculate upon it ? The veil is too thin, I think, to hide the real character of the transaction, which was obviously a money-making business, — a scheme and device to make a large profit by the difference of exchange and the depreciated state of their currency; and this too by the way of loan, and not by the purchase of subsisting and available bills of exchange or promissory notes. I am therefore, upon the whole, well satisfied that the judgment should be affirmed.
Judgment of circuit court reversed, and judgment entered for the appellants.

 Reported 7 Leigh, p. 501.

 Reported 7 Leigh p. 501.

 Note by the president. This is short of the amount by a very minute fractional quantity.